UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>U.S. Department of Justice<br>Antitrust Division<br>450 Fifth Street, N.W., Suite 8700<br>Washington, DC 20530,<br><br>*Plaintiff*,<br><br>v.<br><br>STONE CANYON INDUSTRIES HOLDINGS LLC<br>1875 Century Park East, Suite 320<br>Los Angeles, CA 90067,<br><br>SCIH SALT HOLDINGS INC.<br>10995 Lowell Avenue, Suite 500<br>Overland Park, KS 66210,<br><br>K+S AKTIENGESELLSCHAFT<br>Bertha-von-Suttner-Str. 7<br>34131 Kassel, Hesse<br>Germany,<br><br>and<br><br>MORTON SALT, INC.<br>444 West Lake Street, Suite 300<br>Chicago, IL 60606,<br><br>*Defendants*. | Civil Action No.:<br><br>Judge: |

**COMPLAINT**

The United States of America ("United States"), acting under the direction of the Attorney General of the United States, brings this civil antitrust action against Defendants Stone Canyon Industries Holdings LLC ("Stone Canyon"), SCIH Salt Holdings Inc. ("SCIH"), K+S Aktiengesellschaft ("K+S AG"), and Morton Salt, Inc. ("Morton") to enjoin SCIH's proposed

acquisition of assets including Morton from K+S AG. The United States complains and alleges as follows:

## I. NATURE OF THE ACTION

1. Pursuant to a Transaction Agreement dated October 5, 2020, SCIH intends to acquire assets including Morton from K+S AG for approximately $3.2 billion. As a result of the acquisition, SCIH would control both Morton and US Salt, which are the largest suppliers of certain evaporated salt products in the United States.

2. Together, Morton and US Salt would have a monopoly in the United States and Canada for pharmaceutical-grade salt, the purest grade of evaporated salt, which is used to make life-saving treatments and products for patients in need of dialysis fluid, intravenous saline solution, or other medical products.

3. Additionally, Morton and US Salt are two of only three companies that supply U.S. households with "round-can" table salt, a type of evaporated salt that is sold in 26-ounce round containers with a metal spout and used to flavor food.

4. Morton and US Salt are also two of only three major suppliers in the northeastern United States of bulk evaporated salt, which is used by food processors and chemical manufacturers to make pre-packaged food and everyday cleaning products.

5. Today, customers benefit from competition between Morton and US Salt in the form of lower prices, higher quality products, and/or improved service. The proposed transaction would eliminate this competition, driving the opposite result: higher prices, lower quality products, and poorer service for customers of pharmaceutical-grade salt in the United States and Canada, for customers of round-can table salt in the United States, and for customers of bulk evaporated salt in the northeastern United States.

6. Accordingly, SCIH's acquisition of Morton would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be enjoined.

## II. THE PARTIES AND THE TRANSACTION

7. K+S AG is a chemical company headquartered in Kassel, Germany. In 2020, K+S AG reported revenues of approximately $4.4 billion. K+S AG's Operating Unit Salt Americas business includes Morton as well as K+S Windsor Salt, which sells salt products in Canada, and Sociedad Punta de Lobos, which sells salt products in Chile.

8. Morton is a K+S AG subsidiary with approximately $1 billion in revenue in 2020. Morton is the largest supplier of pharmaceutical-grade salt in the United States and Canada, the largest supplier of round-can table salt in the United States, and one of only three suppliers of bulk evaporated salt in the northeastern United States.

9. Stone Canyon is an industrial holding company incorporated in Delaware and headquartered in Los Angeles, California. Stone Canyon acquired Kissner Group Holdings LP, which it later renamed SCIH, in April 2020.

10. SCIH is a subsidiary of Stone Canyon and is headquartered in Overland Park, Kansas. In 2020, SCIH had revenues of approximately $1 billion. SCIH is a leading supplier of salt products, including evaporated salt.

11. US Salt, a subsidiary of SCIH with approximately $95 million in revenues in 2020, is the nation's second-largest supplier of pharmaceutical-grade salt in the United States and Canada, the second-largest supplier of round-can table salt in the United States, and one of only three suppliers of bulk evaporated salt in the northeastern United States.

12. Pursuant to a Transaction Agreement dated October 5, 2020, SCIH agreed to acquire K+S AG's Operating Unit Salt Americas business, including Morton, for approximately $3.2 billion.

### III. JURISDICTION AND VENUE

13. The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

14. Defendants' activities substantially affect interstate commerce. Defendants sell pharmaceutical-grade salt and round-can table salt throughout the United States and bulk evaporated salt throughout the northeastern United States. This Court has subject matter jurisdiction over this matter pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

15. Defendants have consented to venue and personal jurisdiction in this judicial district. Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c)(2), for Stone Canyon, SCIH, and Morton, and venue is proper for K+S AG, a German corporation, under 28 U.S.C. § 1391(c)(3).

### IV. RELEVANT MARKETS

#### A. Relevant Product Markets

16. Morton and SCIH's US Salt subsidiary both produce and sell evaporated salt. Evaporated salt is a type of sodium chloride produced through "vacuum evaporation." In the vacuum evaporation process, water is pumped into a salt deposit where the salt dissolves, and the resulting brine is forced into an evaporator on the surface where it is boiled in a series of pans until only the salt remains. Evaporated salt is nearly 100% sodium chloride and contains almost

4

no other trace minerals. Because of the evaporation process, individual grains of evaporated salt are also more consistent and regularly shaped than other forms of salt.

17. Evaporated salt is distinct from salt created through other production methods, such as rock salt and solar salt. Rock salt is mined and then crushed into smaller sizes before being transported to the surface. Rock salt is less expensive to produce than evaporated salt, but it is also coarser, irregularly shaped, and contains other minerals and impurities. As a result, rock salt is used for applications that have less demanding quality requirements such as de-icing roads. Solar salt is created when salt water is captured in shallow ponds where the sun evaporates most of the water. It can only be produced in warm climates where the evaporation rate exceeds the precipitation rate. Solar salt is less pure and not as uniform in shape as evaporated salt, but it is purer than rock salt. Solar salt is used for applications such as water softening.

18. Evaporated salt typically is used in applications that require the highest quality of salt, such as human consumption. There are different types of evaporated salt that have different characteristics, end uses, and customers. Three types of evaporated salt produced by Defendants constitute relevant product markets—pharmaceutical-grade salt, round-can table salt, and bulk evaporated salt.

        **i.     Pharmaceutical-Grade Salt**

19. Pharmaceutical-grade salt is the grade of salt with the highest percentage of sodium chloride and thus is the purest grade of evaporated salt. Pharmaceutical-grade salt is used in the pharmaceutical industry as a building block for a number of life-saving treatments and products, including dialysis fluid, intravenous saline solution, and other medical products. Pharmaceutical-grade salt must be evaporated from salt deposits of extremely high purity and

then undergo post-production processing to ensure that it contains virtually no trace minerals or other impurities.

20. Because of these stringent standards, the mining and production process for pharmaceutical-grade salt must be extensively monitored and documented to ensure purity and consistency across production batches. This documentation must then be provided to customers as a validation of the quality and purity of the pharmaceutical-grade salt.

21. Rock salt and solar salt do not meet the purity requirements for pharmaceutical-grade salt. Other grades of evaporated salt—for example, salt used in food processing—also cannot serve as a substitute for pharmaceutical-grade salt. Pharmaceutical-grade salt must contain a higher percentage of sodium chloride than other types of evaporated salt. This ensures that it does not contain trace minerals that would impact the efficacy of pharmaceutical products made using pharmaceutical-grade salt. Pharmaceutical-grade salt also cannot contain additives such as anti-caking agents that are added during the processing of other types of evaporated salt. Because of these requirements, pharmaceutical-grade salt is more difficult to produce than other forms of evaporated salt.

22. In the event of a small but significant increase in price by a hypothetical monopolist of pharmaceutical-grade salt, substitution away from pharmaceutical-grade salt would be insufficient to render the price increase unprofitable. Pharmaceutical-grade salt is therefore a line of commerce, or relevant product market, for purposes of analyzing the effects of the acquisition under Section 7 of the Clayton Act, 15 U.S.C. § 18.

   ii. **Round-Can Table Salt**

23. Table salt is evaporated salt that is processed for human consumption. It is regulated by the Food and Drug Administration ("FDA") and must meet high purity standards.

Table salt also has a highly consistent size across granules and contains agents to prevent clumping and evaporation. Without additional processing—which raises price considerably—rock salt and solar salt cannot meet the same purity requirements or achieve the same consistent granule size as table salt. Pharmaceutical-grade salt meets the purity requirements for table salt but does not contain the necessary agents to prevent clumping and evaporation. As such, rock salt, solar salt, and pharmaceutical-grade salt are not substitutes for table salt.

24. In the United States, the packaging format strongly preferred by consumers for table salt is the round can, which is a 26-ounce cardboard cylinder with a paper label and a metal spout. The round-can's size, shape, material, and metal spout make it an easy receptacle to use one-handed without spilling while cooking or refilling a salt shaker, which is a product characteristic that is highly valued by consumers. Reflecting consumer preference, retailers like grocery stores dedicate shelf space specifically to round-can packaging. As a result, approximately 95% of the table salt sold to consumers in the United States is sold in a round can.

25. Table salt packaged in other containers, such as boxes or bags, is not a reasonable substitute for round-can table salt. Boxes without a metal spout and bags are more difficult to use and store and may spill once opened. Larger packages of table salt also are not reasonable substitutes for round-can table salt, as they contain significantly more salt than an individual can practically use.

26. In the event of a small but significant increase in price by a hypothetical monopolist of round-can table salt, substitution away from round-can table salt would be insufficient to render the price increase unprofitable. Round-can table salt is therefore a line of

commerce, or relevant product market, for purposes of analyzing the effects of the acquisition under Section 7 of the Clayton Act, 15 U.S.C. § 18.

### iii. Bulk Evaporated Salt

27. Bulk evaporated salt is salt that is of sufficient purity to be used for human consumption that is sold in bulk form. Bulk evaporated salt is used to manufacture chemicals necessary to create essential everyday cleaning products such as disinfectants, soap, and bleach. Bulk evaporated salt is also an essential ingredient in nearly all processed pre-packaged foods, such as sauces, chips and other snacks, and frozen meals. Because bulk evaporated salt is incorporated into products end-consumers ingest or touch, it is regulated by the FDA and must meet stringent purity requirements.

28. Customers for bulk evaporated salt include chemical companies and large pre-packaged food manufacturers as well as smaller customers, such as bakeries, that use salt as an essential ingredient in their food products. To accommodate these customers, many of whom purchase thousands of tons of salt per year, evaporated salt is sold in bulk, by the truckload or in containers ranging from 50-pound bags to 2,000-pound "super-sacks."

29. Bulk evaporated salt is distinct from evaporated salt used for other applications. Compared to other types of evaporated salt, it has unique end-uses, customers, and packaging. While pharmaceutical-grade salt and round-can table salt are of sufficient purity, they are priced too high and packaged in quantities that are too small to serve as substitutes for bulk evaporated salt. Bulk evaporated salt also is distinct from rock salt and solar salt, which have lower purity

levels and non-uniform textures that make them unsuitable for chemical and food-production end uses. None of these types of salt can serve as a substitute to bulk evaporated salt.

30. In the event of a small but significant increase in price by a hypothetical monopolist of bulk evaporated salt, substitution away from bulk evaporated salt would be insufficient to render the price increase unprofitable. Bulk evaporated salt is therefore a line of commerce, or relevant product market, for purposes of analyzing the effects of the acquisition under Section 7 of the Clayton Act, 15 U.S.C. § 18.

**B.  Relevant Geographic Markets**

   **i.  Pharmaceutical-Grade Salt**

31. Pharmaceutical-grade salt is manufactured in only a few locations in the United States. From these locations, pharmaceutical-grade salt is shipped to customers throughout the United States and Canada.

32. While pharmaceutical-grade salt is shipped throughout the United States and Canada, shipping it from overseas is prohibitively expensive. This is because pharmaceutical-grade salt may not contain anti-caking agents. Without anti-caking agents, pharmaceutical-grade salt has a short shelf-life and may be damaged by the time and rigors of ocean-shipping. These limitations make ocean-shipping cost-prohibitive.

33. A hypothetical monopolist of pharmaceutical-grade salt in the United States and Canada could profitably impose a small but significant non-transitory increase in price for pharmaceutical-grade salt without losing sufficient sales to render the price increase unprofitable. Accordingly, the relevant geographic market for the purposes of analyzing the effects of the acquisition on pharmaceutical-grade salt under Section 7 of the Clayton Act, 15 U.S.C. § 18, is the United States and Canada.

### ii.     Round-Can Table Salt

34.     Competition among round-can table salt suppliers occurs at a national level. Retailers, many of which are grocery store chains, mass merchandisers, or convenience stores with large national footprints, purchase round-can table salt for all of their locations at once, and suppliers ship round-can table salt from coast to coast.

35.     Round-can table salt is not imported from outside the United States. In addition to being heavy—and therefore expensive to transport—table salt in other countries is typically sold in bags or cardboard boxes. As such, foreign suppliers of table salt typically lack the production facilities to produce round cans for the United States market.

36.     A hypothetical monopolist of round-can table salt in the United States could profitably impose a small but significant non-transitory increase in price for round-can table salt without losing sufficient sales to render the price increase unprofitable. Accordingly, the relevant geographic market for the purposes of analyzing the effects of the acquisition on round-can table salt under Section 7 of the Clayton Act, 15 U.S.C. § 18, is the United States.

### iii.    Bulk Evaporated Salt

37.     Bulk evaporated salt is a product that can be produced at a relatively low cost, but it is heavy and therefore expensive to transport. As a result, customers purchase from nearby suppliers to minimize shipping costs that can be high relative to the value of the bulk evaporated salt being purchased.

38.     Both Morton and US Salt—along with only one other competitor—operate bulk evaporated salt production facilities in upstate New York. All three companies use these facilities to service customers in the northeastern United States, including Connecticut, Delaware, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode

Island, and Vermont. Customers in the northeastern United States can economically procure bulk evaporated salt from only these three locations. Other more distant bulk evaporated salt facilities cannot compete successfully on a regular basis for customers in the northeastern United States because the suppliers are too far away, making transportation costs too great.

39. A hypothetical monopolist of bulk evaporated salt in the northeastern United States could profitably impose a small but significant non-transitory increase in price for bulk evaporated salt without losing sufficient sales to render the price increase unprofitable. Accordingly, the relevant geographic market for the purposes of analyzing the effects of the acquisition on bulk evaporated salt under Section 7 of the Clayton Act, 15 U.S.C. § 18, is the northeastern United States.

## V.    ANTICOMPETITIVE EFFECTS

40. The proposed transaction would lessen competition and harm customers for pharmaceutical-grade salt in the United States and Canada, round-can table salt in the United States, and bulk evaporated salt in the northeastern United States by eliminating the substantial head-to-head competition that currently exists between Morton and US Salt. Customers in each of these markets would pay higher prices and receive lower quality and service as a result of the acquisition.

### A.    Pharmaceutical-Grade Salt in the United States and Canada

41. Morton and US Salt are the only two suppliers of pharmaceutical-grade salt in the United States and Canada, with Morton currently having a market share of around 77% and US Salt a share of around 23%. The acquisition would thus give the combined firm a monopoly in the sale of pharmaceutical-grade salt in the United States and Canada, leaving pharmaceutical

companies and other customers without a competitive alternative for this critical ingredient in dialysis fluid, intravenous saline solution, and other medical products.

42. Morton and US Salt compete to sell pharmaceutical-grade salt on the basis of quality and surety of supply. This competition has resulted in higher quality, lower prices, and better customer service. The combination of Morton and US Salt would eliminate this competition and its future benefits to customers, including pharmaceutical companies. Post-acquisition, the combined Morton and US Salt likely would have the incentive and ability to increase prices and offer less favorable contractual terms.

43. The proposed acquisition, therefore, likely would substantially lessen competition in the production of pharmaceutical-grade salt in the United States and Canada in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

### B. Round-Can Table Salt in the United States

44. Morton and US Salt are two of the largest table salt suppliers in the United States and are two of only three suppliers of round-can table salt in the United States. Morton is the largest supplier of branded round-can table salt in the United States. US Salt is the largest supplier of private-label round-can table salt—which is made by US Salt but sold under the brands of retailers and other third-parties—in the United States. US Salt is also the second-largest supplier of branded round-can table salt, with around six percent of sales.

45. Today, US Salt's private-label and branded round-can table salt products compete directly with Morton's branded round-can table salt. Together, the combined firm would control at least 90% of the round-can table salt market in the United States.

46. The combination of Morton and US Salt would eliminate the head-to-head competition between Morton and US Salt and leave customers in the United States with only two

alternatives for round-can table salt in the United States. Post-acquisition, the combined firm likely would have the incentive and ability to increase prices and offer less favorable contractual terms.

47. Morton and US Salt compete for sales of round-can table salt on the basis of quality, price, and contractual terms such as delivery times. This competition has resulted in higher quality, lower prices, and more reliable delivery. The combination of Morton and US Salt would eliminate this competition and its future benefits to customers, including grocery chains, big box stores, and discount stores.

48. The proposed acquisition, therefore, likely would substantially lessen competition in the production of round-can table salt in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

### C. Bulk Evaporated Salt in the Northeastern United States

49. Three bulk evaporated salt suppliers—Morton, US Salt, and one additional competitor, each with production facilities in upstate New York—compete for bulk evaporated salt customers in the northeastern United States. The combination of Morton and US Salt would eliminate the head-to-head competition between the parties and result in only two remaining competitors in the region.

50. Bulk evaporated salt customers in the northeastern United States, including food processors and chemical manufacturers, have been able to secure lower prices and improved quality and service—such as more reliable delivery—by threatening to switch between Morton and US Salt. The elimination of this head-to-head competition would allow a combined Morton and US Salt to exercise market power to unilaterally increase prices and reduce the quality and service for bulk evaporated salt customers in the northeastern United States.

51. The proposed acquisition, therefore, likely would substantially lessen competition in the production of bulk evaporated salt in the northeastern United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## VI. ENTRY

### A. Difficulty of Entry into Pharmaceutical-Grade Salt in the United States and Canada

52. Entry of new competitors into pharmaceutical-grade salt in the United States would be difficult and time-consuming and is unlikely to prevent the harm to competition that is likely to result if the proposed transaction is consummated.

53. A potential pharmaceutical-grade salt entrant would need to acquire suitable land that includes a salt deposit of sufficient purity, obtain the permits necessary to construct an evaporation and processing facility, possess or obtain appropriate financing for a significant capital expenditure, and then design, construct, and qualify the facility. This process would likely take several years, at a minimum. No new evaporated salt facility has been constructed in the United States in over 20 years.

54. Even if an entrant was able to construct an evaporated salt production facility, before selling a single grain of pharmaceutical-grade salt, it would need to install and test additional equipment needed to meet the exacting purity requirements for pharmaceutical-grade salt. Reputational barriers make entry even more difficult, as customers would be reluctant to switch to an unproven supplier that could not guarantee access to high-quality pharmaceutical-grade salt. Thus, entry would not be timely, likely, or sufficient to mitigate the anticompetitive effects from SCIH's proposed acquisition of Morton.

### B. Difficulty of Entry into Round-Can Table Salt in the United States

55. Entry of new competitors into round-can table salt in the United States would be

difficult and time-consuming and is unlikely to prevent the anticompetitive effects that are likely to result if the proposed transaction is consummated.

56. Even though table salt has lower purity requirements than pharmaceutical-grade salt, a round-can table salt entrant would still need to take all of the steps to construct a facility that a pharmaceutical-grade salt entrant would, including locating an appropriate salt deposit, and investing significant time and money to build the facility.

57. In addition, an entrant in round-can table salt would have to secure a round-can packaging line. The packaging process for round-can table salt, created decades ago, is based on technology from that era and has proven to be difficult to replicate in a price-competitive manner. As a result, potential entrants with access to suitable salt deposits have tried, and failed, to develop round-can packaging technology in the last five years.

58. Entry through the construction of a new round-can table salt facility therefore will not be timely, likely, or sufficient to mitigate the anticompetitive effects of SCIH's proposed acquisition of Morton.

### C. Difficulty of Entry into Bulk Evaporated Salt in the Northeastern United States

59. Entry of new competitors into bulk evaporated salt in the northeastern United States would be difficult and time-consuming and is unlikely to prevent the harm to competition that is likely to result if the proposed transaction is consummated.

60. Just as with pharmaceutical-grade salt or round-can table salt, a new entrant in bulk evaporated salt would need to invest significant time and money to acquire land and construct an evaporated salt processing facility. Entry into bulk evaporated salt in the northeastern United States is particularly difficult because this area has limited salt deposits, which are necessary serve the market.

61. Entry through the construction of a new bulk evaporated salt production facility will therefore not be timely, likely, or sufficient to mitigate the anticompetitive effects from SCIH's proposed acquisition of Morton.

## VII. VIOLATIONS ALLEGED

62. SCIH's proposed acquisition of Morton is likely to substantially lessen competition in the production and sale of evaporated salt products, including pharmaceutical-grade salt in the United States and Canada, round-can table salt in the United States, and bulk evaporated salt in the northeastern United States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

63. The acquisition will likely have the following anticompetitive effects, among others, in the relevant markets:

    a. actual and potential competition between Morton and US Salt will be eliminated;

    b. competition generally will be substantially lessened; and

    c. prices will likely increase and quality and the level of service will likely decrease.

## VIII. REQUEST FOR RELIEF

64. The United States requests that this Court:

    a. adjudge and decree SCIH's acquisition of Morton to be unlawful and in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

    b. preliminarily and permanently enjoin Defendants and all persons acting on their behalf from consummating the proposed acquisition by SCIH of Morton or from entering into or carrying out any other contract,

        agreement, plan, or understanding, the effect of which would be to combine Morton with US Salt;

    c.    award the United States the costs for this action; and

    d.    grant the United States such other relief as the Court deems just and proper.

Dated: April 19, 2021

Respectfully submitted,

COUNSEL FOR PLAINTIFF UNITED STATES:

| | |
|---|---|
| /s/ Richard Powers<br>RICHARD POWERS<br>Acting Assistant Attorney General<br>Antitrust Division | /s/ Kerrie J. Freeborn<br>KERRIE J. FREEBORN* (D.C. Bar #503143)<br>BINDI BHAGAT<br>JANET BRODY<br>GABRIELLA R. MOSKOWITZ (D.C. Bar #1044309)<br>REBECCA VALENTINE (D.C. Bar #989607)<br>Trial Attorneys |
| /s/ Kathleen S. O'Neill<br>KATHLEEN S. O'NEILL<br>Senior Director of Investigation and Litigation<br>Antitrust Division | Defense, Industrials, and Aerospace Section<br>Antitrust Division<br>450 Fifth Street N.W., Suite 8700<br>Washington, DC 20530<br>Telephone: (202) 476-9160<br>Facsimile: (202) 514-9033<br>Email: kerrie.freeborn@usdoj.gov |
| /s/ Katrina Rouse<br>KATRINA ROUSE (D.C. Bar #1013035)<br>Chief<br>Defense, Industrials, and Aerospace Section<br>Antitrust Division | |
| /s/ Jay D. Owen<br>JAY D. OWEN<br>Assistant Chief<br>Defense, Industrials, and Aerospace Section<br>Antitrust Division | *LEAD ATTORNEY TO BE NOTICED |